Law Offices
**Morgan, Lewis & Bockius LLP**
101 Park Avenue
New York, New York  10178-0060
Tel. (212) 309-6000
Fax. (212) 309-6001

Attorneys for Defendants Cablevision
Systems Corporation and Donna Izzo

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------:
ROSEMARY VASQUEZ,                          :
                                           :
            Plaintiff,                     :
                                           :       06 CV 5480 (WCC)
    -against-                              :
                                           :       *Electronically Filed*
CABLEVISION SYSTEMS CORPORATION,           :
and DONNA IZZO, individually,              :
                                           :
            Defendants.                    :
------------------------------------------:

**RULE 56.1 STATEMENT OF UNDISPUTED FACTS**
**IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants CSC Holdings, Inc. (incorrectly identified in the Complaint as Cablevision Systems Corporation) ("CSC" or the "Company") and Donna Eiseman (incorrectly identified in the Complaint as "Donna Izzo") ("Eiseman") (CSC and Eiseman together, "Defendants"), by and through their attorneys, Morgan, Lewis & Bockius LLP, hereby submit this Rule 56.1 Statement of Undisputed Facts in Support of their Motion for Summary Judgment pursuant to Southern District of New York Local Civil Rule 56.1.

Plaintiff's Employment With CSC[1]

1. Plaintiff began working for CSC as a Customer Service Representative ("CSR") in 1998, when CSC acquired her former employer's business. (Pl. Dep. 18-20). Plaintiff held that position until September 25, 2000, during which time she reported to Eiseman in CSC's West Nyack location. (Pl. Dep. 19-20, 22, 24, 48, 58).

2. On September 25, 2000, Plaintiff became a Direct Sales Representative ("SR"), reporting to Diana Robinson in the Direct Sales Department, also in West Nyack. (Pl. Dep. 58, 64; CC Aff. Ex. 9).

3. After she changed positions, Plaintiff did not report to or interact with Eiseman again. (Pl. Dep. 67-68).

4. During her employment at CSC, Plaintiff received several promotions and at least five raises. (Pl. Dep. 50-51, 61-62; CC Aff. Exs. 7, 8, 9, 10, 11).

5. As an SR, Plaintiff was required to visit potential customers' homes in an effort to sell the Company's products and services. (Pl. Dep. 73-74, 86).

6. When Plaintiff first joined the Direct Sales Department, the SR's were not assigned to specific territories. Rather, they canvassed any homes they chose in the area that was served by the West Nyack operation. (Pl. Dep. 73-74, 86).

7. The only exception to this open territory related to multiple-dwelling units ("MDUs"), such as apartment complexes. (Pl. Dep. 73).

8. All of the SRs were assigned to particular MDUs, and were required to canvass the residents within those MDUs to sell the Company's products and services. (Pl. Dep. 73).

---

[1] Citations to the record are as follows: (i) Plaintiff's deposition transcript, "Pl. Dep. __;" (ii) Dominick Garaffa's deposition transcript, "DG Dep. __;" (iii) Richard Farber's deposition transcript, "RF Dep. __;" and (iv) Affidavit of Dominick Garaffa, "DG Aff. ¶ __." Cited pages from the depositions of Plaintiff, Mr. Garaffa and Mr. Farber are attached in numerical order to the Affidavit of Christopher L. Casazza ("CC Aff.") as Exhibits ("Exs.") 1, 2 and 3, respectively.

This amounted to little more than learning when apartments changed tenants, typically from the building superintendent, and attempting to sell the new residents cable service. (Pl. Dep. 73).

9. Under this system, most SRs focused on two types of customers, those whose service had been cancelled for failure to pay and those who recently moved into a residence. (DG Dep. 12-13).

10. While these tended to be easier sales for the SRs than finding new customers who had not previously used the Company's services, they often were not profitable for CSC. (DG Dep. 12-13; DG Aff. ¶ 2).

11. For example, customers whose service was cancelled for failure to pay their bills often do not pay their bills after the service is reinstalled. (DG Dep. 12-13). Under this scenario, the Company paid the SR a commission for the sale, but then did not receive payment for the services. (DG Aff. ¶ 3).

Change to the Sales Organization

12. In early 2002, new senior sales management wanted to reduce the number of non-paying and recidivist customers, for whom the SRs were paid commissions but who did not remain long-term, paying customers of the Company, and focus on broadening its new customer base. (DG Aff. ¶ 6).

13. To accomplish this goal, the Company implemented a wholesale reorganization of its direct sales force. (DG Dep. 7, 11-12, 16, 18). Under this new system, the SRs were divided into one of two teams – Sweep or Target. (Pl. Dep. 98, 135; DG Dep. 7, 11, 18).

14. The new system constituted a "radical" change which affected all SRs and was a "completely different" way of doing sales from the old system. (Pl. Dep. 106, 143; DG Dep. 12, 16).

15. Plaintiff does not know how SRs were assigned to Sweep or Target, and does not know whether any SRs were allowed to choose to which team they were assigned. (Pl. Dep. 105-106, 115-116).

16. Robinson told Plaintiff that she was assigned to Sweep because Robinson thought Plaintiff would be more successful in that role and make more money. (Pl. Dep. 105).

17. None of the SRs, regardless of which team they were on, were given permanent territories. (Pl. Dep. 106, 112-113, 114; DG Dep. 16, 23-24). Moreover, SRs were no longer assigned to particular MDUs. (Pl. Dep. 137).

18. Individuals on the Sweep team were assigned to a particular area for a two-week period and the entire Sweep team would be assigned to the same area for the same two-week period. (Pl. Dep. 106, 112-113, 114, 120; DG Dep. 14, 16).

19. Each Sweep SR was assigned lead cards containing the addresses and other pertinent information for non-subscribing residents within that Sweep area, and was required to solicit the residents listed on those cards. (Pl. Dep. 23-24, 120; DG Dep. 14, 19, 23-24, 25-26).

20. Under this methodology, the entire team would "Sweep" through an area and then move on to a different area. (DG Dep. 14).

21. Recognizing that it was more difficult to make sales under this new system, which focused primarily on new subscribers, the Sweep representatives were given lower sales goals than under the prior system. (Pl. Dep. 120-122; DG Aff. ¶ 10). The Sweep sales goals were also lower than the Target sales goals. (Pl. Dep. 104; DG Dep. 24, 33; DG Aff. ¶ 10).

22. The Target SRs were also given lead cards containing addresses of potential customers. (DG Dep. 19, 23-24, 25-26). These cards contained addresses that were previously serviced by the Company but, for some reason, had been disconnected within the past 30-60 days. (Pl. Dep. 138; DG Dep. 23-24).

23. Those disconnects could be for a variety of reasons, including that the prior customer moved or no longer wished to utilize the Company's services (i.e., transferred to a satellite provider). (Pl. Dep. 138; DG Dep. 12-13, 14).

24. Plaintiff does not think that Robinson assigned sales cards based on SRs' national origins. (Pl. Dep. 117-118).

Reaction Of The SRs To The New Sales Organization

25. Approximately 75% of CSC's SRs were assigned to Sweep. (DG Dep. 19-20).

26. Plaintiff testified that many Sweep SRs in the West Nyack facility were unhappy with that assignment. (Pl. Dep. 107, 114). She further testified that every Sweep SR at West Nyack, all of whom except for her were non-Hispanic, struggled with this new role. (Pl. Dep. 69-72, 107, 109, 133).

27. Moreover, according to Plaintiff, many of these SRs voiced concerns about losing their jobs and, in fact, at least two other SRs were terminated for performance-related reasons at or around the same time her employment was terminated. (Pl. Dep. 114, 124, 277).

28. Indeed, the majority of SRs, regardless of whether assigned to Sweep or Target, were unhappy with, and struggled with, this new system. (DG Aff. ¶¶ 8, 9).

29. Many SRs who had previously been successful were unable to adapt to this new system and, after failing to meet their goals, were terminated (or left CSC immediately before being terminated). (Pl. Dep. 124, 277; DG Aff. ¶ 9). These individuals were assigned to both Target and Sweep, and were of all national origins. (DG Aff. ¶ 9).

30. The Company has achieved the goals it strived for in connection with the reorganization. While it makes fewer sales, customer retention and profitability has significantly improved. (DG Aff. ¶ 11).

Plaintiff's Performance and Termination

31. Plaintiff's performance deteriorated after she was assigned to Sweep and she missed the Sweep team's sales quotas three times in 2003.[2] (Pl. Dep. 107; CC Aff. Exs. 5, 6).

32. Plaintiff was counseled on each occasion that failing to meet the quotas could lead to her termination, yet she showed no signs of improvement. (CC Aff. Exs. 4, 5, 6).

33. Indeed, despite being concerned about her poor sales numbers, other than complain about her assignment to Sweep, it is unclear what, if anything, Plaintiff did to try to improve her sales numbers after she was counseled. (Pl. Dep. 273-275).

34. On June 12, 2003, Plaintiff's employment was terminated for failing to meet her numbers. (Pl. Dep. 148-149, 270, 272, 282).

35. At least two other West Nyack Sweep SRs were terminated for failing to meet their numbers at or around the same time. (Pl. Dep. 124, 277).

36. Indeed, by the time Plaintiff left CSC, the number of West Nyack SRs had been reduced from approximately eleven to seven because several of them could not meet the Sweep sales quotas. (Pl. Dep. 123-124).

37. Eiseman played no role in the decision to terminate Plaintiff's employment. (Pl. Dep. 248-249).

Plaintiff's Complaints

38. While she was employed as a CSR, Plaintiff made various complaints to CSC about Eiseman. (Pl. Dep. 220-221, 227). Those complaints primarily involved Eiseman's alleged use of profane language and her management style. (Pl. Dep. 220-221, 227, 240, 242).

39. For example, Plaintiff claims that Eiseman: (1) gave one employee a work schedule that was preferable to the schedules given to all other CSRs; (2) instructed Plaintiff to

---

[2] Plaintiff also missed her numbers on at least one occasion prior to Sweep. (CC Aff. Ex. 4).

service a customer before counting her cash drawer; (3) told another employee not to speak with Plaintiff; (4) sent Plaintiff and another non-Hispanic employee to training in Newark, New Jersey, while other CSRs attended training in Warwick, New York; and (5) left Plaintiff alone in the walk-in center for an hour. (Pl. Dep. 175-185, 187-189, 193-196, 200-201, 204, 209-211, 213-214, 216-217).

40. Other CSRs also complained about Eiseman's management style. (Pl. Dep. 219-220).

41. Plaintiff testified that she does not believe that any of Eiseman's conduct was based on or related to her national origin. (Pl. Dep. 186-217, 254-267).

42. Moreover, Plaintiff testified that, when she raised her concerns with the Company, she did not attribute them to her national origin. (Pl. Dep. 226-227, 233).

43. The Company conducted investigations into Eiseman's language and management style. (Pl. Dep. 234-236; RF Dep. 36-39).

44. As a result of these investigations, Eiseman was counseled about the use of inappropriate language in the workplace and was provided with additional management training. (Pl. Dep. 236; CC Aff. Exs. 12, 13).

45. All of these complaints and investigations occurred on or before June 2000, and Plaintiff made no more complaints about Eiseman after she transferred to the SR position in September 2000. (Pl. Dep. 234-236, 247).

46. Plaintiff claims that her car's tires were slashed in November 2002. (Pl. Dep. 184-185, 213-214). Plaintiff, however, did not see her tires being slashed and does not know of anyone else who did. (Pl. Dep. 184-185, 214). Plaintiff does not even know if her tires were slashed or were just flat. (Pl. Dep. 216-217).

47. Plaintiff does not think this incident had anything to do with her national origin. (Pl. Dep. 217).


Dated: New York, New York.
     August 21, 2007

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Amber Kagan
    Amber Kagan
    Christopher L. Casazza

101 Park Avenue
New York, NY 10178-0600
212.309.6000

*Attorneys for Defendants*